**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **LORI TAYLOR,** | ) | Case No. 2:24-cv-2348 |
| | ) | |
| Plaintiff, | ) | Judge |
| | ) | |
| v. | ) | |
| | ) | |
| **OHIO CIVIL RIGHTS COMMISSION,** | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **ANGELA PHELPS-WHITE, Personally and in Her Official Capacity as Executive Director of the Ohio Civil Rights Commission,** | ) ) ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT WITH JURY DEMAND**

I. <u>**INTRODUCTION**</u>

1. This is an action for compensatory and punitive damages and injunctive relief arising from a series of acts of sex discrimination and retaliation by the Defendants, the Ohio Civil Rights Commission, and its Executive Director, Angela Phelps-White, in violation of Title VII of the Civil Rights Act of 1964, as amended, the First and Fourteenth Amendments to the United States Constitution, and 42 United States Code Section 1983.

Defendant Phelps-White subjected the Plaintiff, Lori Taylor, the Commission's former regional director for the Dayton and Cincinnati regional offices, to a discriminatory and retaliatory hostile working environment. This included falsely accusing Ms. Taylor of misconduct, intentionally and adversely interfering with Ms. Taylor's work, dramatically overloading her with unnecessary tasks, and depriving her of critical support within the regions she oversaw until Ms. Taylor was ultimately forced to resign. Defendant Phelps-White openly

1

took these actions against Ms. Taylor because she, as a female manager, raised concerns of sex discrimination against herself and other women by a high-ranking male manager. Defendant Phelps-White's overt hostility toward Ms. Taylor because of her sex and her complaints of discrimination continued a pattern of Defendant Phelps-White favoring male employees and punishing anyone who challenged the inequitable environment Defendant Phelps-White fostered, and continues to foster, within the Commission.

**II.     JURISDICTION AND VENUE**

2. This Court has federal question jurisdiction over the Plaintiffs' claims pursuant to Title 28 U.S.C. Section 1331, this being an action pursuant to 42 U.S.C. Sections 1983 and 2000e, 29 U.S.C. Section 621, and the United States Constitution.

3. At all relevant times, the parties resided and conducted business, and the events herein took place, in Franklin, Montgomery, and Hamilton counties, within the Southern District of Ohio, Eastern Division.

**III.    PARTIES**

4. Plaintiff Lori Taylor is a female resident of Montgomery County, Ohio, within the jurisdiction of the Southern District of Ohio, Eastern Division.

5. Defendant Ohio Civil Rights Commission ("the Commission") is an instrumentality of the State of Ohio. It is an employer for purposes of Title VII of the Civil Rights Act of 1964, as amended, with approximately 75 employees. Its stated purpose is to prevent, investigate, and remedy discrimination and retaliation in employment, public accommodations, credit, housing, and higher education throughout Ohio.

6. Defendant Angela Phelps-White is the Commission's executive director, its chief executive staff member, who has responsibility for directly supervising the Commission's

executive staff and indirectly supervising the remainder of its entire staff, as well as approving the Commission's internal procedures, and training, and recommending and advising the commissioners on matters of policy and individual cases before the Commission.  Defendant Phelps-White is a resident of Franklin County, Ohio, within the jurisdiction of the Southern District of Ohio, Eastern Division.  She is sued in her personal and official capacities.

7. The actions of the Defendants and their agents and employees, which were within the scope of their employment, were at all relevant times undertaken, in concert with each other, because of intentional discrimination and retaliation and conducted with malice and knowing disregard for the Plaintiff's rights under clearly established federal law.

## IV.     FACTS

11. Plaintiff Lori Taylor began working at the Ohio Civil Rights Commission in April 2021, when she was hired as a regional supervisor for the combined regional offices in Dayton and Cincinnati.  Shortly thereafter, she was promoted to regional director.

12. Prior to joining the Commission's staff, Ms. Taylor had a great deal of experience as a supervisor at another Ohio public agency, as well as a civil rights investigator for a similar agency in the state of Oklahoma.

13. Ms. Taylor's promotion to regional director followed the resignation of the prior regional director, a female employee who resigned from the Commission and reported to the U.S. Equal Employment Opportunity Commission that she had been forced out of her job due to unequal treatment based on sex.

14. By the time of the resignation of Ms. Taylor's predecessor, at least two other senior female employees of the Commission had made allegations of sex discrimination, including its former general counsel, who reported that she was terminated due to her sex and

3

age and because she raised concerns of discrimination, and its former head of Human Resources, who raised similar concerns after she resigned instead of accepting an involuntary demotion.

15. Each of the women who had raised these concerns reported that the principal perpetrator of the discrimination and retaliation against them was Defendant Angela Phelps-White, the Commission's executive director since March 2020.

16. Defendant Phelps-White had an established practice within the Commission of open favoritism, and at times, sexual objectification, of male employees, whom she refused to hold accountable for poor performance and would refer to openly as her "eye candy." Meanwhile, she often treated women with open disrespect and targeted them for criticism, had them perform menial tasks, and in some cases demoted them, terminated them, or drove them to resign.

17. Defendant Phelps-White also displayed a pattern of retaliating against any subordinate who raised concerns within the Commission, without providing any protection for those whose concerns included protected activity, such as complaints of discrimination on behalf of themselves or others.

18. Although Defendant Phelps-White mistreated men who questioned her decisions as well as women, her retaliatory reactions toward women who did so were stronger.  She openly stated that there were too many women in leadership at the Commission, that they were responsible for creating problems and issues (*i.e.* questioning her decisions), and that she wanted to address this purported dynamic by hiring more male managers.

19. Since her appointment as executive director, Defendant Phelps-White has fostered an atmosphere in which subordinates feared speaking out on any issue or sharing concerns with even their close colleagues, lest Defendant Phelps-White find out and punish them.

20. Defendant Phelps-White was hesitant to promote Ms. Taylor to regional director, but did so at the strong recommendation of Scott Marshall, the Commission's male director of human resources, one of the male employees she strongly favored at the time.

21. In her role as regional director, Ms. Taylor led the administrative and investigative staff of the southwest region of the state of Ohio, centered in two separate offices—one in Dayton and one in Cincinnati. The caseload and logistical needs of this region exceeded that of other regions because it encompassed two large urban areas and their separate offices.

22. Ms. Taylor's work from the time of her appointment as regional director until approximately June 2022 met and exceeded the Commission's expectations, as she was helping the region, which had struggled with its workload for years, get onto a successful track.

23. Although Ms. Taylor's work performance was objectively good, it was not acknowledged as such by Defendant Phelps-White. For instance, when a male employee would speak favorably of Ms. Taylor's performance, Defendant Phelps-White would respond by raising criticisms of her or her work.

24. One of the male employees shown favoritism by Defendant Phelps-White was the Commission's Chief Finance Officer, Dilip Mehta.

25. Defendant Phelps-White hired Mr. Mehta into a senior-level position at the Commission with little formal process, despite her knowledge that he had a history of complaints against him from staff at a prior Ohio state agency.

26. Mr. Mehta interacted frequently with staff in the Dayton/Cincinnati region, including Ms. Taylor, because both regional offices were under physical construction, and he was overseeing aspects of both construction projects.

27. In 2022, Ms. Taylor became aware of female employees having unpleasant interactions with Mr. Mehta in which he treated them dismissively or spoke to them abruptly or condescendingly.

28. On June 22, 2022, Ms. Taylor sent a text message that Mr. Mehta misinterpreted. Ms. Taylor had noted that something was scheduled "at 1"—meaning 1pm—and Mr. Mehta thought she had incorrectly stated something was "on l"—meaning on the first floor of a building.

29. Instead of trying to clear up the confusion, Mr. Mehta called Ms. Taylor and started loudly yelling at her and demanding explanations for a perceived undermining of his authority. This followed prior discussions that day in which Mr. Mehta had also raised his voice toward Ms. Taylor without provocation.

30. Ms. Taylor reported this to the then-director of Human Resources, Scott Marshall, and informed him she believed Mr. Mehta was mistreating her because she was a woman.

31. Ms. Taylor's actions in reporting and discussing with others the discrimination she experienced and witnessed, as well as an overall pattern of sex-based behavior by Mr. Mehta, who did not work in her region, went above and beyond what was expected under the Commission's internal discrimination reporting policies and was outside of her day-to-day duties as the director for the Dayton and Cincinnati regions.

32. Ms. Taylor also informed Mr. Marshall that she was aware of at least two other female staff who believed they were being mistreated by Mr. Mehta based on their sex.

33. Ms. Taylor also discussed her concern that Mr. Mehta was engaging in a pattern of mistreating women based on sex with her subordinates and other colleagues, and informed Mr. Marshall she had spoken with others who agreed Mr. Mehta was engaging in discrimination.

6

34. Mr. Marshall began an investigation of Mr. Mehta's conduct upon receiving Ms. Taylor's report. However, he was only a short time from leaving the Commission due to Defendant Phelps-White's gross, discriminatory, and retaliatory mismanagement.

35. Mr. Marshall did take some steps to investigate Mr. Mehta's conduct prior to his departure, including by attempting to interview Mr. Mehta.

36. Defendant Phelps-White immediately and openly interfered with Mr. Marshall's attempts to investigate Ms. Taylor's concerns. This included insisting on participating directly in Mr. Marshall's interview of Mr. Mehta, during which she repeatedly interrupted Mr. Marshall in order to defend Mr. Mehta or answer questions for him, despite her lack of any firsthand knowledge of his interactions with Ms. Taylor.

37. Following the interview, and after Mr. Marshall had formally resigned, Defendant Phelps-White openly stated to Mr. Marshall that she intended to punish Ms. Taylor for complaining about Mr. Mehta, saying that Ms. Taylor would be cut off from information. Mr. Marshall challenged this open expression of retaliatory animus, but Defendant Phelps-White replied that she would rather get rid of Ms. Taylor than "lose Dilip."

38. Defendant Phelps-White was true to her word and embarked on a campaign of retaliation against Ms. Taylor. Consistent with her pattern of discrimination and retaliation against others, Defendant Phelps-White did this not only because Ms. Taylor had engaged in protected activity and spoken out openly about an important issue, but because Ms. Taylor, a woman, had spoken out against one of Defendant Phelps-White's favored male managers.

39. Defendant Phelps-White instructed employees not to share information with Ms. Taylor, including about the construction projects affecting both physical offices in her region.

40. The Defendants also repeatedly denied Ms. Taylor's requests for basic security measures to be taken for the offices in her region, comparable to those of other regions, to the point that she needed to purchase a window lock personally for the Dayton office.

41. Once Mr. Marshall had been replaced as director of human resources, Defendant Phelps-White also used the human resources investigation of Mr. Mehta to punish Ms. Taylor.

42. In particular, despite the completion of the investigation by the new HR director, Defendant Phelps-White refused to allow it to be issued, and sought to force the HR director to conclude, without evidence, that Ms. Taylor, rather than Mr. Mehta, had committed discrimination by stereotyping Mr. Mehta as a sexist due to his South Asian cultural heritage.

43. As a result of Defendant Phelps-White's constant interference in the investigation, the Commission failed to issue any report at all with respect to the reports of discrimination by Mr. Mehta during Ms. Taylor's employment, and it took no disciplinary or corrective action against him in response to his confirmed aggressive behavior toward Ms. Taylor and others.

44. Defendant Phelps-White also deliberately overloaded Ms. Taylor with work responsibilities after her reports of discrimination.

45. This included requiring Ms. Taylor, an experienced civil rights investigator, who had already completed her onboarding training upon her arrival at the Commission, to complete a long series of unnecessary training modules on issues she was both familiar with and excelling in at the time they were assigned.

46. Defendant Phelps-White also intentionally and unnecessarily deprived Ms. Taylor of critically needed staffing in her region, deliberately creating a situation where Ms. Taylor was overworked to the point of extreme exhaustion.

47. Following Ms. Taylor's reports of discrimination, two key employees in her region, including the region's only supervisor, left the Commission. Defendant Phelps-White prevented the replacement of these employees for a period of months, knowing that doing so would force Ms. Taylor into an impossible situation. In contrast, when other positions were open, Defendant Phelps-White either allowed an interim replacement to be appointed or obtained clearance to directly hire a chosen replacement, bypassing any delays through the ordinary administrative process for hiring Commission employees.

48. The effect of not having an intermediate supervisor for her region was that Ms. Taylor was compelled to act as the direct supervisor for the entire investigative staff under her, in addition to her regular duties.

49. Between her obligation to supervise workers and the lack of supervisory support to review her multi-office region's large caseload, Ms. Taylor was forced into a situation where she was working nearly every day, including nights and weekends, to avoid the region defaulting on its legal obligations to complete all charge investigations within one year of filing.

50. At one point during this period, the Commission's investigators were given permission to work overtime on weekends to clear a backlog. Ms. Taylor was informed that as the only supervisory employee for her region, if investigators in both Cincinnati and Dayton chose to come in to work on a weekend, she would have to split time between Cincinnati and Dayton to supervise both offices in person.

51. Defendant Phelps-White was well aware of this overload on Ms. Taylor, and made it clear this was intentional. When one experienced investigator volunteered to serve as a temporary supervisor for the region, as he had done in the past without any problem, Defendant Phelps-White refused permission, stating that she intended for Ms. Taylor to suffer on her own.

52. Ms. Taylor continued to report the ongoing campaign of unequal and retaliatory treatment toward her as it occurred, including to Mr. Marshall's successor in Human Resources, through an outside investigator retained by the Commission, and through an external charge of discrimination and retaliation filed with the U.S. Equal Employment Opportunity Commission.

53. The individual members of the Commission were directly aware of Ms. Taylor's unequal and retaliatory treatment by Defendant Phelps-White. The commissioners chose not to take any action to address or correct either these actions or any of the numerous similar acts of discrimination and retaliation confirmed to them by active and former Commission employees.

54. Multiple employees and former employees reported to individual commissioners, including the then-chair of the Commission, Lori Barreras, direct statements made by Defendant Phelps-White expressing her intent to discriminate against women, Black employees, employees who objected to discrimination or complained about the male employees she favored, and even employees indirectly associated with those she had targeted for discrimination and retaliation.

55. Instead of acting in any way to address these numerous corroborating reports of discrimination, the Commission decided to actively suppress these reports and hire an outside investigator. The investigator's focus was specifically restricted to avoid the allegations previously raised by Ms. Taylor and multiple others who had filed administrative charges of discrimination and retaliation, ensuring no findings would be issued that jeopardized Defendant Phelps-White's position or required the Commission to remedy the many allegations against it.

56. Ms. Taylor participated in this sham investigation, and reported her own unequal and retaliatory treatment, but, as the Commission intended and instructed, Ms. Taylor's reports and others' reports about the treatment she experienced from Defendant Phelps-White were omitted from the outside investigator's report.

57. By early 2023, Ms. Taylor came to the realization that the Commission was unwilling to address her concerns, and that she could not continue undergoing the exclusion, overloading, and hostility directed toward her by Defendant Phelps-White, all of which had created a sex-based and retaliatory hostile work environment because of her complaints of discrimination by one of Defendant Phelps-White's favored male employees.

58. Accordingly, Ms. Taylor sought and obtained alternative employment, and despite needing to take a pay cut to do so. On February 21, 2023, Ms. Taylor notified the Commission that she would be resigning, effective March 3, 2023.

59. The actions of the Defendants described herein, including the above-described harassment, hostile work environment, and constructive discharge, were motivated by Ms. Taylor's sex and her protected activity. These actions were undertaken with malice and knowing and reckless disregard for Ms. Taylor's statutory and constitutional rights.

60. The actions of the Defendants have caused Ms. Taylor loss of income, reputational harm, anxiety, anger, humiliation, embarrassment, and stress.

61. Ms. Taylor has taken all of the actions she is required to take to exhaust her administrative remedies for purposes of Title VII of the Civil Rights Act of 1964, as amended.

62. Ms. Taylor filed a timely charge with the U.S. Equal Employment Opportunity Commission on October 20, 2022, alleging the sex discrimination and retaliation described above. Ms. Taylor's notice of right to sue was issued by the U.S. Department of Justice on February 12, 2024. The notice paperwork is attached as Exhibit 1 to this Complaint.

## V. FEDERAL CLAIMS FOR RELIEF

### A. DISCRIMINATION AND RETALIATION IN VIOLATION OF TITLE VII

63. The preceding paragraphs are hereby incorporated and re-alleged.

64. The sex discrimination against the Plaintiff by Defendant Ohio Civil Rights Commission, as well as its retaliation against the Plaintiff for her opposition to discrimination and her participation in investigations related to discrimination, including discriminatory and retaliatory harassment, hostile work environment, and constructive discharge, violated Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. Section 2000e *et seq.*).

B. **DISCRIMINATION AND RETALIATION IN VIOLATION OF THE UNITED STATES CONSTITUTION**

65. The preceding paragraphs are hereby incorporated and re-alleged.

66. By discriminating against the Plaintiff in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, and by discriminating and retaliating against the Plaintiff in response to her speech on a matter of great public concern and for raising equal protection concerns, the actions of Defendants Phelps-White in her personal and official capacities, including the discriminatory and retaliatory harassment, hostile work environment, and constructive discharge she directed toward the Plaintiff, violated the First and Fourteenth Amendments to the United States Constitution, which are actionable pursuant to Title 42 U.S.C. Section 1983. The Plaintiffs' official-capacity claims are for prospective equitable and ancillary relief pursuant to the *ex parte Young* doctrine.

VI. **PRAYER FOR RELIEF**

67. **Wherefore,** the Plaintiff asks for judgment against the Defendants and requests:

(A) Compensatory and punitive damages in an amount to be determined at trial;

(B) An order reinstating the Plaintiff to her former employment with the Ohio Civil Rights Commission, directing that she be paid commensurate with her experience and responsibilities, and compelling the Defendants to refrain from further acts of discrimination and retaliation in violation of federal law;

(C) Declaratory relief in the form of a declaration that the Defendants violated the Plaintiff's federal constitutional and statutory rights by discriminating and retaliating against her;

(D) The costs of this action, including reasonable attorney's fees;

(E) Pre- and post-judgment interest and compensation for the tax consequences of the delayed payment of the Plaintiff's lost compensation; and

(F) Any other relief deemed appropriate by the Court.

Respectfully Submitted,

/s/Frederick M. Gittes
Frederick M. Gittes (0031444)
fgittes@gitteslaw.com
Jeffrey P. Vardaro (0081819)
jvardaro@gitteslaw.com
The Gittes Law Group
723 Oak St.
Columbus, OH 43205
(614) 222-4735
Fax: (614) 221-9655
Attorneys for the Plaintiff

## JURY DEMAND

The Plaintiffs hereby demand a jury of eight (8) to determine all issues triable by jury in this matter.

/s/Frederick M. Gittes
Frederick M. Gittes (0031444)